UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
NORTHERN DIVISION

ESTATE OF LINDSEY DRAKE,

                Plaintiff,                      Case No. 20-CV-11684

v.                                      Honorable Thomas L. Ludington

CITY OF SAGINAW, et al.,

                Defendants.

_____/

**OPINION AND ORDER GRANTING IN PART AND DENYING IN PART
DEFENDANTS' MOTION TO DISMISS**

Amiliana Sanchez and Lindsey Drake were killed in a car accident in the early morning hours of June 25, 2016. The vehicle was driven by Rodolfo Sanchez who is alleged to have been consuming intoxicants and controlled substances. Plaintiff, the estate of Lindsey Drake, alleges that Mr. Sanchez's vehicle had been stopped by Saginaw police officers who later permitted Mr. Sanchez to drive the vehicle despite their knowledge that he could not lawfully or safely drive the vehicle. Plaintiff brought this action against the City of Saginaw Police Department and officers Matthew Carpus, Julian Guevara, Tyler Williamson, DeShawn Harris, and Isaac Babinski. The amended complaint identifies two counts. Count I is plead against the officers pursuant to 42 US.C. § 1983 and the Fifth and Fourteenth Amendments and alleges that permitting or ordering the Sanchez vehicle to leave the traffic stop while Sanchez was incapacitated "placed Lindsey in a position where she was more vulnerable to danger than she had been when the vehicle was pulled over." ECF No. 14 at PageID.94. Count II is directed to the City of Saginaw and alleges that on information and belief, the City Police Department "failed to maintain a policy, practice, or custom of requiring intoxicated drivers to be arrested." *Id.* at PageID.94.

Defendants filed a motion to dismiss pursuant to FRCP 12(b)(6) on September 16, 2020. ECF No. 17. The response and reply were timely filed. ECF Nos. 19, 21, 22. Defendants' motion will be granted in part and denied in part.

## I.

A pleading fails to state a claim under Rule 12(b)(6) if it does not contain allegations that support recovery under any recognizable legal theory. *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). In considering a Rule 12(b)(6) motion, the Court is to construe the pleading in the non-movant's favor and accepts the allegations of facts therein as true. *See Lambert v. Hartman*, 517 F.3d 433, 439 (6th Cir. 2008). The pleader need not provide "detailed factual allegations" to survive dismissal, but the "obligation to provide the 'grounds' of his 'entitle[ment] to relief' requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 555 (2007). In essence, the pleading "must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face" and "the tenet that a court must accept as true all of the allegations contained in a complaint is inapplicable to legal conclusions." *Iqbal*, 556 U.S. at 678–79 (quotations and citation omitted).

Documents attached to a complaint "become part of the pleadings and may be considered on a motion to dismiss." *Commercial Money Ctr., Inc. v. Illinois Union Ins. Co.*, 508 F.3d 327, 335–36 (6th Cir. 2007); Fed. R. Civ. P. 10(c). In addition, "when the exhibits contradict the general and conclusory allegations of the pleading, the exhibits govern." *Griffin Industries, Inc. v. Irvin*, 496 F.3d 1189, 1206 (11th Cir. 2007); *Mengel Co. v. Nashville Paper Prods. & Specialty Workers Union, No. 513*, 221 F.2d 644, 647 (6th Cir. 1955); *Hamilton Foundry & Mach. Co. v. Int'l Molders & Foundry Workers Union of N. Am.*, 193 F.2d 209, 216 (6th Cir. 1951); *Simmons*

*v. Peavy–Welsh Lumber Co.*, 113 F.2d 812, 813 (5th Cir. 1940) ("Where there is a conflict between allegations in a pleading and exhibits thereto, it is well settled that the exhibits control.").

## II.

Lindsey Drake, a 30 year old, was present at a party with her daughter, Amiliana and her daughter's father, Rodolfo Sanchez on the evening of June 24, 2016. ECF No. 14 at PageID.82. Mr. Sanchez was drinking alcohol and using illegal drugs during the party. *Id.* At some point, an attendee called the police to report a fight involving Mr. Sanchez. *Id.* at PageID.82–83. Shortly thereafter, Mr. Sanchez, Ms. Drake, Amiliana, Ms. Cortez (Mr. Sanchez's sister) and two others[1] left the party in Ms. Drake's vehicle, which was driven by Mr. Sanchez. *Id.*

Mr. Sanchez "forced his way into driving the vehicle with threats of violence." *Id.* at PageID.82–83. During the 911 phone call, a party attendee informed the police that Mr. Sanchez "smelled of intoxicants and had very thick slurred speech." *Id.* The attendee said she observed Mr. Sanchez "drinking vodka, tequila, and Remy Martin." *Id.* Another attendee "observed [Mr. Sanchez] drinking peppermint schnapps from a bottle in the car." *Id.* The amended complaint alleges that a passenger in the vehicle[2] reported that Mr. Sanchez drove recklessly after leaving the party "at speeds in excess of 95 miles per hour, through yield and stop signs" and "eventually pull[ed] the car over after it began to smoke following an impact with a curb." *Id.*; ECF No. 14-1 at PageID.125. In contrast, a police report attached to the amended complaint stated that Ms. Cortez told police her brother's driving was fine that night. ECF No. 14-1 at PageID.106.

The amended complaint alleges the following occurred after the vehicle left the party. The police encountered Mr. Sanchez at a gas station and "briefly detained him." ECF No. 14 at

---

[1] The two others left the vehicle prior to the accident. ECF No. 17-2 at PageID.209. They also do not appear on the body camera video.

[2] The passenger left the vehicle prior to the accident.

PageID.84. Mr. Sanchez was in the vehicle initially. *Id.* The officers questioned Mr. Sanchez. He "was clearly and obviously intoxicated based on his appearance, mannerisms, and the odor of alcohol coming from his person." *Id.* Mr. Sanchez "explicitly and unequivocally told Defendant Officers that he was intoxicated and was not able to safely operate a motor vehicle." *Id.* Ms. Drake and Ms. Cortez also spoke with police. The police observed Amiliana in the vehicle. *Id.* at PageID.84–85. Specifically,

> Defendant Officers ordered them to return to [Ms. Drake]'s vehicle with [Mr. Sanchez] behind the wheel, even though (1) [Mr. Sanchez] manifested signs of intoxication including the odor of alcohol and/or other intoxicants emitting from his person; (2) [Mr. Sanchez] was shirtless and behaving erratically at 4:00 AM; and (3) there was a 4-month-old infant in the vehicle.

*Id.* Further, Mr. Sanchez "told Defendant Officers he was refusing to drive [Ms. Drake]'s vehicle because he was intoxicated, at which point he was instructed by Defendant Officers to either drive away or be arrested." ECF Nos. 14 at PageID.87; 14-1 at PageID.180. The amended complaint further alleges that "Defendant Officers instructed [Mr. Sanchez] to 'Get the f*ck out of the City'—meaning the jurisdiction of the City of Saginaw." ECF No. 14 at PageID.86 (redaction added). Mr. Sanchez also admitted there was an open fifth of liquor in the vehicle at the time. *Id.* Additionally, the amended complaint alleges that Mr. Sanchez lacked a valid driver's license and Ms. Drake's vehicle registration was expired. *Id.* at PageID.86–87. One of the police reports attached to the amended complaint, Deputy Jose DeLeon's report, includes a notation that at the hospital, Mr. Sanchez informed police officers that he was drunk, had an open fifth in his vehicle, and that he was told to "Get the f*ck out of the City." ECF No. 14-1 at PageID.180.

Exhibit 4 of the amended complaint, a body camera video from an unidentified police officer, stands in contrast to the allegations of the amended complaint. The video begins when Mr. Sanchez is out of the vehicle and Ms. Drake and Ms. Cortez are exiting the vehicle. ECF No. 14-

1 at PageID.133. Ms. Drake then removes Amiliana from the backseat of the vehicle and comforts her. *Id.* at timestamp 00:00 – 00:47. The vehicle is in the right-lane of the road and appears to be partially blocking the entrance to a gas station. *Id.* There are multiple police officers, some who speak with Ms. Cortez and others who speak with Mr. Sanchez. *Id.* It is unclear from the video if police pulled the vehicle over or if the vehicle was already stopped when police encountered it. However, a police officer does make a reference to the vehicle being "pulled over." *Id.* at 3:08– 3:12. Mr. Sanchez does not have a shirt. His demeanor and speech appear to be relatively calm. His behavior is not erratic. The police officer whose voice is most clearly heard on the video appears to be more interested about the fight that occurred earlier in the evening than Mr. Sanchez' fitness to drive the vehicle. Four minutes into the video, an unidentified police officer asks, "You guys are all cool together, right?", followed by what appear to be affirmative responses by Ms. Cortez and Ms. Drake. *Id.* at 4:10. A few seconds later, a police officer states, "You guys can go ahead and go home." *Id.* at 4:22. Mr. Sanchez' initial response is unintelligible, but he does not protest the police officer's proposition, and instead tries to shake his hand and then responds, "Thank you man." *Id.* No visible objection by Mr. Sanchez is displayed and no profanity is heard.

Tragically, less than 10 minutes after the traffic stop, Mr. Sanchez "intentionally and/or recklessly accelerated to a speed of approximately 52-59 miles per hour and crashed the vehicle into a large tree at approximately 34-44 miles per hour at the time of impact." ECF No. 14 at PageID.85. Ms. Drake and Amiliana Sanchez died at the scene. *Id.*

After the crash, a police officer noted "[u]pon opening the door [of the vehicle] I could clearly detect the strong odor of intoxication" and "could clearly detect the odor of alcohol coming from [Mr. Sanchez] as he spoke" when he was being placed in the ambulance. ECF No. 14-1 at PageID.180. A blood test from Mr. Sanchez later revealed "lorazepam, THC, N-

desmethyldiazepam, cocaine, benzoylecgonine, and hydrocodone" in Mr. Sanchez' system and his blood alcohol level was 0.20. ECF No. 14 at PageID.88. Mr. Sanchez pled no contest to one count of OWI causing death and one count of OWI causing serious injury and is serving a 207 to 420-month sentence with the Michigan Department of Corrections. *Id.*

Finally, the amended complaint alleges that "Defendant Department and Defendant City maintained a custom or policy that permitted or vested discretion to officers to release or demand an individual known to be intoxicated to operate a vehicle on a public roadway" even though that policy "is contrary to currently accepted law enforcement standards." *Id.* It further alleges "it is contrary to currently accepted law enforcement standards for a law enforcement officer to release a person from their custody and control who is sufficiently intoxicated to serve as a danger to himself or others." *Id.* at PageID.89. Additionally, "Defendant Department and Defendant City failed to maintain a policy prohibiting officers from permitting, demanding, or ordering an individual without a valid driver's license from operating a motor vehicle on the public roadway." *Id.* The Department and City "had a custom or policy of hiring or retaining law enforcement officers without appropriate training or certification to conduct standardized field sobriety tests ('SFSTs') in accordance with the standards prescribed by the National Highway Traffic Safety Administration" and "failed to maintain policies requiring law enforcement officers to either conduct SFSTs on individuals under suspicion of operating a motor vehicle while intoxicated, or to request that such testing be conducted." *Id.* at PageID.89–90. "By permitting, requiring, or demanding that [Ms. Drake], Amiliana, and [Ms. Cortez] be passengers in the vehicle [Mr. Sanchez] was driving, Defendant Officers created a danger that had been abated by their initial traffic stop." *Id.* at PageID.90.

### III.

Section 1983 provides in relevant part:

> Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress.

42 U.S.C. § 1983. To establish a claim under § 1983 a "plaintiff must establish both that 1) she was deprived of a right secured by the Constitution or laws of the United States and 2) the deprivation was caused by a person acting under color of state law." *Redding v. St. Eward*, 241 F.3d 530, 532 (6th Cir. 2001).

Plaintiff's first claim is grounded on the Due Process Clause of the Fourteenth Amendment, as was the plaintiff's claim in *DeShaney v. Winnebago County Department of Social Services*. 489 U.S. 189, 195 (1989). In *DeShaney*, the plaintiff was a child subjected to a series of beatings by his father. The defendant, Winnebago County Department of Social Services, received complaints that DeShaney was being abused by his father but they did not act to remove him from his father's custody. His father finally beat him so severely that he suffered permanent brain damage. Plaintiff and his mother sued alleging that the defendant failed to intervene and protect DeShaney from his father's violence. The Court held that the Department of Social Services could not be held liable for the injuries inflicted on DeShaney by his father, even though it was the Department's general responsibility to prevent child abuse and the Department had, in fact, returned the child to his father's house after having taken temporary custody of him. Instead, the Court explained the purpose of the clause was to protect the people from the State, and "is phrased as a limitation on the State's power to act, not as a guarantee of certain minimal levels of safety and security." *Id.*

As such, "a State's failure to protect an individual against private violence simply does not constitute a violation of the Due Process Clause." *Id.* at 197.

## A.

Courts have recognized two narrow exceptions to *DeShaney*. First, a governmental actor may violate the due process clause "by allowing a third party to harm a person in government custody[.]" *Hunt v. Sycamore Cmty. Sch. Dist. Bd. of Educ.*, 542 F.3d 529, 534 (6th Cir. 2008) (quotations and citations omitted). The second exception is where a governmental actor violates the due process clause by "creating a particular danger to the victim." *Id.* For application of the latter exception—known as the "state-created danger doctrine"—a plaintiff must establish the following:

> (1) an affirmative act by the state which either created or increased the risk that the plaintiff would be exposed to an act of violence by a third party; (2) a special danger to the plaintiff wherein the state's actions placed the plaintiff specifically at risk, as distinguished from a risk that affects the public at large; and (3) the state knew or should have known that its actions specifically endangered the plaintiff.

*Jones v. Reynolds*, 438 F.3d 685, 690 (6th Cir. 2006).

A "failure to act is not an affirmative act under the state-created danger theory," *Cartwright v. City of Marine City*, 336 F.3d 487, 493 (6th Cir. 2003); s*ee also Jones*, 438 F.3d at 691 (holding that there was no evidence of a cognizable affirmative act by police officers that failed to stop a drag race that ultimately caused the death of the plaintiff); *Sargi v. Kent City Bd. Of Educ.*, 70 F.3d 907 912–13 (6th Cir. 1995) (failing to provide bus drivers with a plan for managing emergencies, taking seizure victim home without medical intervention, failing to maintain communication devices on a bus, and failing to tell the bus driver of the student's medical condition were not affirmative acts); *Reed v. Knox County Dep't of Human Servs.*, 968 F. Supp. 1212, 1220–22 (S.D.

Ohio 1997) (failing to inform family of foster child's violent history, placing child in home, and failing to remove child were not affirmative acts).

In determining whether the state created or increased the risk of private harm "[t]he question is not whether the victim was safer during the state action, but whether [she] was safer before the state action than [she] was after it." *Cartwright*, 336 F.3d at 493 (holding that the plaintiff had failed to state a claim of state-created danger where the defendants removed the plaintiff from the shoulder of a two-lane highway and deposited him in the parking lot of a convenience store); *see also DeShaney*, 489 U.S. at 201 (holding that the state's temporary custody of the child did not alter the analysis, "for when it returned him to his father's custody, it placed him in no worse position than that in which he would have been had it not acted at all"). In other words, state actors are not liable where they "merely return[] a person to a situation with preexisting danger." *Bukowski v. City of Akron*, 326 F.3d 702, 709 (6th Cir. 2003).

**B.**

The Defendant Officers may, indeed likely did, have probable cause to detain Mr. Sanchez and/or impound the vehicle. However, the legal analysis in assessing the *DeShaney* exception is not based upon the benefit of hindsight, nor is what a reasonable police officer would have done in the situation relevant. It is based on whether Defendants conduct elevated the danger to Ms. Drake by allowing Mr. Sanchez to drive away from the stop.

Defendants first argue that Plaintiff was not in custody and therefore the custody exception does not apply. Plaintiff does not provide a response to this argument, nor are there any facts alleged that would support this argument. The custody exception does not apply in this case.

Defendants acknowledge that "while the facts of this case are certainly tragic," there is no viable § 1983 claim under the state created danger exception either. ECF No. 17 at PageID.211. Defendants argue,

> Plaintiff's artful pleading cannot change the fact that Sanchez had already driven under the influence of alcohol/drugs before his alleged gas station encounter with the Officer-Defendants. As such, the notion that the Officers created and/or increased the subject danger is belied by the allegations in Plaintiff's own Complaint.

ECF No. 17 at PageID.210–11 (emphasis and footnote omitted). In response, Plaintiff clarified its allegations,

> [T]he state action here was Defendant Officers' explicit demand that [Mr. Sanchez] get in the driver's seat and drive away with three other passengers when [Mr. Sanchez] was refusing to drive the vehicle and only did so at the command of Defendant Officers. . . . [Therefore] Plaintiff was in a safer position before Defendant Officers' demanded [Mr. Sanchez] drive away in such an intoxicated state with Plaintiff as a passenger[.] Prior to Defendant Officers' affirmative conduct, any previous risk of danger to Plaintiff created by [Mr. Sanchez] had been completely abated as the vehicle was stopped prior to Defendant Officers' arrival and [Mr. Sanchez] indicated that he was not intending to resume driving the vehicle.

ECF No. 21 at PageID.270–71.

Defendants correctly highlight the fact that Mr. Sanchez had driven the vehicle with Ms. Drake, Amiliana, and Ms. Cortez prior to the interaction with police. However, the alleged facts are sufficient to meet the state created danger exception because, under the facts alleged in the amended complaint, the initial risk to Ms. Drake ended with the stop of the vehicle. Accordingly, the case is distinguishable from *Koulta v. Merciez*, 477 F.3d 442 (6th Cir. 2007). In *Koulta*, a driver became intoxicated and was driving in the early morning between her house, her ex-boyfriend's house, a 7-11 where she purchased additional alcohol, her ex-boyfriend's best friend's house, and back to her ex-boyfriend's house. *Id.* at 444. The ex-boyfriend's mother called the police and reported the driver as an "'unwanted' person on her property." *Id.* The driver's license plate was

- 10 -

expired and the driver informed the police officers that she had been drinking. *Id.* In response, the police officers ordered her to leave the property, without conducting an investigation into her expired plate or her insobriety. *Id.* Less than 15 minutes after being ordered off the premises, she ran a red light and killed the driver of a different vehicle. *Id.* The Sixth Circuit concluded that the deceased's estate could not bring a claim under the state-created danger exception because the "officer's failure to act will not satisfy the test." *Id.* at 445. The Circuit, while lamenting the death of the deceased and acknowledging the criminal culpability of the driver, concluded that

> [t]he offices' failure to administer a breathalyzer test (or otherwise to determine the extent of [the driver's] drinking) before ordering her to leave the property may well have been negligent, but it did not 'create' or 'increase' the danger of [the driver] drinking and driving—that pre-dated their arrival on the scene. The same is true of the offices' decision to order [the driver] to leave the property. . . . [T]he officers told [the driver] to 'go home' when they first arrived and later ordered her to leave the property. Neither directive required [the driver] to drive home if she lacked the capacity to do so. Nothing prevented her either (1) from driving down the block, then calling a cab or waiting to drive the rest of the way home after becoming sober or (2) from asking the officers for assistance in getting home.

*Id.* at 446.

In the instant case, Plaintiff alleges that the vehicle was stopped when Mr. Sanchez informed the police officers that he was too incapacitated to drive, but that he was then ordered to get in the vehicle and drive out of the city. *See* ECF No. 14 at PageID.85 ("Defendant Officers ordered them to return to [Ms. Drake's] vehicle with [Mr. Sanchez] behind the wheel, even though (1) [Mr. Sanchez] manifested signs of intoxication including the odor of alcohol and/or other intoxicants emitting from his person; (2) [Mr. Sanchez] was shirtless and behaving erratically at 4:00 AM; and (3) there was a 4-month-old infant in the vehicle."). Properly applying the standard of review in assessing a FRCP 12(b)(6) motion, this Court must assume the facts alleged in the complaint are true. Therefore, for purposes of this motion, the danger to Ms. Drake and Amiliana had ended. The vehicle was stopped, they were outside the vehicle, and Mr. Sanchez had decided

- 11 -

he was unable to finish the drive. However, police officers ordered him to return to the driver's seat and leave the city of Saginaw.

Plaintiff's allegation that the officers elevated the risk to Ms. Drake is not precluded by the body cam video. Plaintiff included one body cam video as an attachment to her complaint. It reflects Mr. Sanchez without a shirt, but his speech is coherent and his behavior appears calm. The interaction between the police officers and Mr. Sanchez appeared to end calmly and Mr. Sanchez appears grateful to be able to go home. The evidence, although different from the allegations in the amended complaint, is not dispositive. It is unclear what occurred prior to the beginning of the video, what other officers said to Mr. Sanchez when the police officer wearing the body camera was speaking with Ms. Cortez, and if Mr. Sanchez voluntarily got behind the wheel of the vehicle after the video ended or if there was an additional interaction between Mr. Sanchez and police after the video ended. Plaintiff has successfully alleged a claim that Defendant police officers affirmatively increased the risk that she would be exposed to an act of violence on behalf of Mr. Sanchez.

Second, Defendants argue,

[B]ecause Sanchez' conduct 'endangered every driver and passenger on the road that evening,' Plaintiff cannot establish the second element (i.e., a 'special' danger) of the applicable test either.

ECF No. 17 at PageID.211 (emphasis omitted). In response, Plaintiff contends that Defendants placed Plaintiff at risk because they "knew she was a passenger in the vehicle." ECF No. 21 at PageID.271–72. Again, Defendants read *Koulta* too narrowly. The Sixth Circuit held that the deceased "was exposed to a risk that affected the public at large, not a discrete group of individuals. [The driver's] behavior endangered every driver and passenger on the road that evening, and Koulta was the unlucky driver who happened to be in the wrong place at the wrong time." *Koulta*,

477 F.3d at 447–48. Plaintiff does not allege that she was an unlucky passenger in a random vehicle on the road that early morning. The instant case more closely resembles *McQueen*. In *McQueen*, the Sixth Circuit found that a group of five school children left unsupervised with an armed classmate put those five children in special danger. *McQueen v. Beecher Community Schools*, 433 F.3d 460, 468–69 (6th Cir. 2006).  Ms. Drake was a passenger in the vehicle that Mr. Sanchez was driving. She is a member of a discrete group of individuals placed at a risk of harm with Mr. Sanchez behind the wheel—the three passengers in the same vehicle Mr. Sanchez was driving.

Defendants do not posit an argument against the third prong of the state-created danger exception. Plaintiff has alleged sufficient facts to demonstrate, given the standard of review, that Defendant police officers increased the risk of danger to her. Because Plaintiff's claims allege that Ms. Drake was safer before Mr. Sanchez' encounter with the Saginaw police than she was after he was ordered to drive in his intoxicated state, she has successfully stated a claim of state-created danger.

## IV.

Plaintiff's second claim is a *Monell* claim against the Saginaw City and the Saginaw Police Department. Defendants argue that Plaintiff fails to identify an unlawful policy or custom that was a direct causal link to the alleged constitutional violation. ECF No. 17.

### A.

A § 1983 claim against a municipality requires a two-pronged inquiry. *Collins v. City of Harker Heights*, 503 U.S. 115, 120 (1992); *see also Doe v. Claiborne Cty, Tenn. by & through Claiborne Cty. Bd. of Education*, 103 F.3d 495, 505–06 (6th Cir. 1996). First, it must be determined whether the plaintiff has asserted the deprivation of a constitutional right. *Id.* at 120–21. Second,

it must be decided whether the municipality is responsible for the violation. *Id.* For liability to attach, both requirements must be met. *Id.*

A plaintiff may not recover against a municipality on a theory of respondeat superior. *Monell v. Dep't of Soc. Servs.*, 436 U.S. 658, 691 (1978). Instead, a plaintiff must prove that municipality officials maintained a policy or custom that violated the plaintiff's constitutional rights. *Id.* at 690–91. The custom does not have to be approved through official channels. *Id.* at 691. Rather, it should be considered a legal institution that is "so permanent and well settled as to constitute a 'custom or usage' with the force of law." *Feliciano v. City of Cleveland*, 988 F.2d 649, 655 (6th Cir. 1993) (quoting *Monell*, 436 U.S. at 691). "That a plaintiff has suffered a deprivation of federal rights at the hands of a municipal employee will not alone permit an inference of municipal culpability and causation." *Board of Cty. Comm'rs*, 520 U.S. at 406.

The Sixth Circuit has identified four ways in which a plaintiff may demonstrate that a municipality's custom or usage is illegal. *Thomas v. City of Chattanooga*, 398 F.3d 426, 429 (6th Cir. 2005). They are: "(1) the municipality's legislative enactments or official agency policies; (2) actions taken by officials with final decision-making authority; (3) a policy of inadequate training or supervision; or (4) a custom of tolerance or acquiescence of federal rights violations." *Id.* For the failure to train legal theory, "the failure to train [must] amount[] to deliberate indifference to the rights of persons with whom the police c[a]me into contact." *City of Canton v. Harris*, 489 U.S. 378, 388–89 (1989). The Sixth Circuit has explained that the plaintiff "must show prior instances of unconstitutional conduct demonstrating that the [municipality] has ignored a history of abuse and was clearly on notice that the training in this particular area was deficient and likely to cause injury." *Fisher v. Harden*, 398 F.3d 837, 849 (6th Cir. 2005).

- 14 -

**B.**

Defendants argue that first, Plaintiff "failed to establish an underlying due process violation" thereby nullifying the *Monell* claim. ECF No. 17 at PageID.212. However, as outlined above, Plaintiff has successfully articulated a § 1983 claim against Defendant Officers for a state-created danger.

Second, Defendants argue that "Plaintiff has also failed [to] identify a specific policy or custom with a direct causal link to the injuries Decedent suffered on 6/24/2016 – in fact, Plaintiff actually argued in its initial Complaint that the pertinent City policies were entirely lawful." ECF No. 17 at PageID.212 (emphasis omitted). Defendants contend that

> nothing in Plaintiff's Amended Complaint – or in the Exhibits attached thereto –
> meets the exactly failure-to-train standard . . . . Indeed, there is no indication that
> the City of Saginaw has recurring and/or systemic issues with like incidents, and
> Plaintiff does not appear to quarrel with that key fact.

ECF No. 17 at PageID.213 (footnote omitted).

Plaintiff counters that Defendants Department and City "maintained a custom or policy that permitted or vested discretion to officers to release or demand an individual known to be intoxicated to operate a vehicle on a public roadway," "failed to maintain a policy prohibiting officers from permitting, demanding, or ordering an individual without a valid driver's license from operating a motor vehicle on the public roadway," "had a custom or policy of hiring or retaining law enforcement officers without appropriate training or certification to conduct standardized field sobriety tests ('SFSTs') in accordance with the standards prescribed by the National Highway Traffic Safety Administration," and "failed to maintain policies requiring law enforcement officers to either conduct SFSTs on individuals under suspicion of operating a motor vehicle while intoxicated." ECF No. 21 at PageID.275–77. Plaintiff also explains that

"Defendants Babinski, Carpus, Guervara, and Harris were not trained or certified in conducting SFSTs." *Id.* She states,

> [T]he fact that Municipal Defendant does not have a policy to ensure that all of its law enforcement officers serving in a road patrol capacity have the minimum basic training expected of rookie officers is so inadequate that it is likely to result in the violation of constitutional rights—as the dangers of drinking and driving are well known. Moreover, the allegations in Plaintiff's First Amended Complaint either directly or through reasonable inference plausibly support the notion that if Defendant Officers had received training and current certifications on SFSTs, they would have placed [Mr.] Sanchez under arrest for the offense of Operating While Intoxicated and [Ms. Drake]'s life would have been spared.

*Id.* at PageID.280.

Plaintiff's response focuses solely on the second prong of the deliberate indifference test—that the municipality was on notice of deficient training. However, Plaintiff does not allege any facts of "prior instances of unconstitutional conduct" demonstrating that [Defendants] ha[ve] ignored a history of abuse." *Fisher*, 398 F.3d at 849. Plaintiff has simply not alleged any facts of prior unconstitutional conduct by the City of Saginaw or the City of Saginaw Police Department. As such, Plaintiff's *Monell* claim will be dismissed.

## C.

Third, Defendants argue to the extent that Plaintiff asserted a claim against individual defendants in their official capacity, the claims should be dismissed because a *Monell* claim is only valid against the governmental entity. ECF No. 17 at PageID.213–14. Plaintiff's complaint asserts a § 1983 against Defendant Officers and the case caption states the action is being brought against the individual Defendants in their personal and official capacities. ECF No. 14 at PageID.79, 92. The *Monell* claim is only alleged against Defendants Saginaw and Saginaw Police Department. Therefore, the only possible explanation is that Plaintiff has attempted to assert a § 1983 claim

against the officers in their official capacity. However, "official-capacity suits generally represent only another way of pleading an action against an entity of which an officer is an agent." *Hager v. Melo*, 502 U.S. 21, 25 (1991). Plaintiff did not address this argument in her response. Defendants are correct that any claim against the individual officers in their official capacity is encompassed by the *Monell* claim, which can only be brought against the municipality. Therefore, to the extent that the Amended Complaint asserted claims against individual Defendant police officers in their official capacity, the claims will be dismissed.

## V.

Finally, Defendants argue that even if Plaintiff alleged sufficient facts to state a claim, Defendant Officers are still entitled to qualified immunity. ECF No. 17 at PageID.214. Qualified immunity is "an immunity from suit rather than a mere defense to liability." *Mitchell v. Forsyth*, 472 U.S. 511, 526 (1985). The doctrine protects government officials "from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982). "Qualified immunity balances two important interests—the need to hold public officials accountable when they exercise power irresponsibly and the need to shield officials from harassment, distraction, and liability when they perform their duties reasonably." *Pearson v. Callahan*, 555 U.S. 223, 231 (2009).

The existence of qualified immunity depends on whether a defendant's action violated clearly established law. *Id.* at 243–44. "This inquiry turns on the 'objective legal reasonableness of the action, assessed in light of the legal rules that were clearly established at the time it was taken.'" *Id.* at 244 (quoting *Wilson v. Layne*, 526 U.S. 603, 614 (1999). "To be clearly established, a right must be sufficiently clear 'that every reasonable official would [have understood] that what

he is doing violates that right.'" *Reichle v. Howards*, 132 S. Ct. 2088, 2093 (2012). "[E]xisting precedent must have placed the statutory or constitutional question beyond debate." *Ashcroft v. al-Kidd*, 563 U.S. 731, 741 (2011). The Court has discretion regarding the sequence with which to conduct the analysis. *Pearson*, 555 U.S. at 236. Thus, the Court may hold that a right is not clearly established law without first analyzing whether the relevant facts actually establish a constitutional violation. *Id.* Qualified immunity protects "all but the plainly incompetent or those who knowingly violate the law." *Malley v. Briggs*, 475 U.S. 335, 341 (1986).

"Once the qualified immunity defense is raised, the burden is on the plaintiff to demonstrate that the officials are not entitled to qualified immunity." *Silberstein v. City of Dayton*, 440 F.3d 306, 311 (6th Cir. 2006). The relevant inquiry is whether "it would be clear to a reasonable officer that his conduct was unlawful in the situation he confronted." *Saucier v. Katz*, 533 U.S. 194, 202 (2001).

### A.

Defendants argue that "in June of 2016 it was not 'clearly established' that an officer's failure to arrest someone like Rodolfo Sanchez could give rise to a viable § 1983 claim. In fact, the pertinent caselaw . . . illustrates that, at all relevant times, such inaction did not amount to a recognized due process violation." ECF No. 17 at PageID.215–16 (emphasis omitted). As a result, Defendants contend the individual defendants are entitled to qualified immunity on the Fourteenth Amendment claim. *Id.*

Plaintiff counters that "if *Koulta* sets the standard, as Defendants argue (and Plaintiff agrees) for purposes of raising a state-created danger claim, then *Koulta* similarly must clearly establish the right for which Plaintiff claims a constitutional deprivation." ECF No. 21 at PageID.282–83. In their reply, Defendants argue,

> Specifically, at the time 6/24/16 incident, it was not clearly established that, in this Circuit, ordering an intoxicated non-party to 'go home' could give rise to a viable § 1983 claim under a state-created danger theory. In fact, the pertinent caselaw illustrates that, at all relevant times, such conduct did not amount to a due process violation.

ECF No. 22 at PageID.291 (emphasis and footnote omitted). In further support, Defendants include a footnote stating,

> *See Koulta*, *supra* at 444 ('The officers ordered Lucero to leave the premises'); *See also* EFC No. 23, p. 11, Page ID 345 (referring to 'Defendant Officers' explicit demand that Rodolfo get in the driver's seat and drive away').

*Id.* Defendants' effort to highlight the similarity between *Koulta* and the instant case actually demonstrates the key difference. In *Koulta* the driver was directed to leave the premises. In the amended complaint, Plaintiff alleges the officers ordered Mr. Sanchez to get behind the wheel and drive out of their jurisdiction. In *Koulta*, the Sixth Circuit highlighted the fact that the officers ordered the driver to leave the property, not to drive home. *Koulta*, 477 F.3d at 446. They even offered two alternatives, albeit improbable, but possible, for the driver to comply with their orders without requiring her to drive home in her inebriated state—driving her vehicle down the block (and off the property) then calling a cab or waiting and sobering up before driving home or asking the officers to assist her in getting home.

Conversely, in this case, according to the amended complaint and as shown by the video, Mr. Sanchez' vehicle was stopped. Mr. Sanchez was out of the vehicle during his encounter with the police officers. He was not asked to stop blocking traffic or leave the gas station. Instead, according to the allegations in the amended complaint, he was ordered to "get the f*ck out of the city" and the officers demanded he drive away. Ms. Drake's right to be free from a state-created danger by the police officers directing an intoxicated driver to get behind the wheel and drive was clearly established.

The second part of the analysis is whether a violation of her clearly established rights occurred. "At the motion to dismiss stage in the litigation, the qualified immunity inquiry and the Rule 12(b)(6) standard become intertwined." *Keating v. City of Miami*, 598 F.3d 753, 760 (11th Cir. 2010); *see also Morgan v. Swanson*, 659 F.3d 359, 384 (5th Cir. 2011); *Dahl v. Kilgore*, 2018 WL 6574785 at * 3 (W.D. Ky. 2018). As outlined earlier, Plaintiff pled sufficient facts that Defendant Police Officers violated her right to be free from state-created-danger. Defendant Officers' request for qualified immunity will be denied.

## VI.

Accordingly, **IT IS ORDERED** that Defendants' Motion to Dismiss, ECF No. 17, is **GRANTED IN PART AND DENIED IN PART**.

It is further **ORDERED** that Count II is **DISMISSED**.

It is further **ORDERED** that Defendants City of Saginaw and City of Saginaw Police Department are **DISMISSED**.

Dated: December 4, 2020

s/Thomas L. Ludington
THOMAS L. LUDINGTON
United States District Judge