UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
NORTHERN DIVISION

ESTATE OF AMILIANA SANCHEZ,

                    Plaintiff,                           Case No. 1:20-cv-11685

v.                                             Honorable Thomas L. Ludington
CITY OF SAGINAW et al.,                United States District Judge

                    Defendants.

and

ESTATE OF LINDSEY DRAKE,

                    Plaintiff,                           Case No. 1:20-cv-11684

v.                                             Honorable Thomas L. Ludington
CITY OF SAGINAW et al.,                United States District Judge

                    Defendants.
_____/

**OPINION AND ORDER DENYING MOTIONS FOR SUMMARY JUDGMENT**

In June 2016, friends and family gathered for a party in Saginaw, Michigan. As the sun set, tensions rose, and a fight broke out. An intoxicated man drove five of the people away. But one partygoer called 911, reporting the incident as a kidnapping involving a car with expired plates.

Five officers from the Saginaw Police Department found the car and four people. A video reflects evidence of intoxication, an admitted drug purchase, and slurred requests for the officers to search the car and to follow it home. The officers responded by telling the group to drive home.

Four minutes later, the car crashed, killing two of the three passengers. As explained hereafter, a jury must determine whether the officers were aware of the driver's intoxication and whether they were deliberately indifferent to the potential for harm.

**I.**[1]

**A.**

The key people involved in the events of this case are as follows:

1. Lindsey Drake died in the car crash. She is the mother of Amiliana Sanchez, and she was the girlfriend of Rudy Sanchez.
2. Amiliana Sanchez is a baby who also died in the car crash. She was the daughter of Rudy and Lindsey.
3. Rudy Sanchez drove the Chevrolet Malibu and survived the crash. Rudy was the boyfriend of Lindsey, was the father of Amiliana, and is the brother of Nikki Cortez.
4. Nikki Cortez is Rudy's sister and survived the crash. She was fighting with her girlfriend at the party, left with Rudy in the Malibu, and survived the crash.
5. Isaac Babinski is the police officer who first found the Malibu and its occupants.
6. Julian Guevara is the second officer who arrived at the scene.
7. Tyler Williamson is the third officer who arrived at the scene.
8. Deshawn Harris is the fourth officer who arrived at the scene.
9. Matthew Carpus is the fifth and final officer who arrived at the scene.
10. Lieutenant David Kendziorski was the supervisor of all the officers in this case. He also conducted the Internal Affairs investigation of the events at issue here.

**B.**

On June 24, 2016, four-month-old Amiliana was at a party with her parents Lindsey and Rudy, as well as her aunt Nikki. ECF No. 17 at PageID.180. From 4:00 PM to 3:00 AM, the more alcohol and drugs Rudy consumed, "the more angry he became." *Id.*; ECF No. 17-2 at PageID.206. Eventually, he beat up Nikki's girlfriend Melissa Dockham, and he hit "Lindsey several times and choked her." *Id.* at PageID.204–06.

Melissa's mother "called 911," ECF No. 17-2 at PageID.205, because Rudy "was clearly highly intoxicated," "had a hard time walking, and was staggering around," *id.* at PageID.207 ("Additionally[,] he smelled of intoxicants and had very thick slurred speech."). Rudy became angrier when the police were called and allegedly "forced his way into driving the vehicle with

---

[1] The cases were only consolidated for discovery purposes, ECF No. 32, so all citations in this Order are to *Estate of Sanchez v. City of Saginaw*, No. 1:20-CV-11685, unless stated otherwise.

threats of violence" to take Nikki, Lindsey, and Amiliana home. ECF No. 17 at PageID.180. Melissa and a friend named Kaleb Hunt joined them. ECF No. 17-2 at PageID.203–04. Melissa's mother called 911 again and reported that Rudy kidnapped a "female" in a Chevrolet Malibu that had expired plates. ECF No. 67-12 at PageID.1139–40. After Rudy dropped off Kaleb, ECF No. 17-2 at PageID.207, the ladies repeatedly told Rudy to drive safer until he pulled over "got out of the car, and started to beat" Nikki, prompting Melissa to flee "on foot," *id.* at PageID.204.

The remaining events were captured by Officer Isaac Babinski's[2] dash camera and Officer Deshawn Harris's[3] body camera—no other video was furnished.[4] *See generally* Defs.' Resp. Ex. 14, ECF No. 78 [hereinafter "Babinski Cam"]; Defs.' Resp. Ex. 9, ECF No. 78 [hereinafter "Harris Cam"]. *But see* ECF Nos. 67-8 at PageID.1034–35 (testifying that Julian Guevara lied about whether he followed the Malibu, despite a dash camera showing that he did); 67-12 at PageID.1137 (acknowledging the existence of footage from the dash camera in Harris and Williamson's car); 17-3 at PageID.226 (acknowledging surveillance footage of the crash).

At 4:07 AM, investigating the reported kidnapping, Officer Babinski happened upon the Malibu parked in the roadway near the Marathon gas station on Michigan Avenue in Saginaw, Michigan, where he found Rudy and Nikki huddled outside the car. *See* Babinski Cam, at 1:00. Shirtless and clad in oversized denim shorts, Rudy complied with Babinski's search request,

---

[2] Isaac Babinski worked for the Saginaw Police as of May 22, 2014. ECF No. 67-6 at PageID.972.
[3] Deshawn Harris worked for the Saginaw Police as of 2016. ECF No. 67-9 at PageID.1048.
[4] Guevara Dep., ECF No. 67-8 at PageID.1034–35 (testifying that he lied about whether he followed the Malibu, despite a dash camera showing that he did); Internal Affairs Investigation, ECF No. 67-12 at PageID.1137 (acknowledging the existence of a video from the dash camera in Harris and Williamson's car); Lt. David Kendziorski Dep., ECF No. 67-13 at PageID.1149 (finding that "Carpus, Babinski, Guevara[,] and William, um, were not in compliance with the body-worn camera policy," and that "Carpus and Guevara, um, did not utilize their in-car recording systems or dash cam during the encounter, and that that was a violation"); Carrollton Twp. Police Dep't Case R., ECF No. 17-3 at PageID.226 (acknowledging a surveillance video of the crash).

placing his hands behind his back as if expecting handcuffs. *Id.* at 1:55–2:09. Officer Babinski searched Rudy's person and instructed him to stand off the roadway on the grass, where Officer Julian Guevara[5] questioned him until joined by Officers Tyler Williamson[6] and Matthew Carpus.[7] *Id.* at 2:10–3:15.

Meanwhile, Officer Babinski talked with Nikki, soon joined by Officer Deshawn Harris. Harris Cam, at 0:01–0:35. Lindsey emerged from the front passenger seat and cradled baby Amiliana throughout the stop. *See id.* at 0:36. Officer Babinski requested Nikki's identification, and she candidly shared her prior felony convictions and accused Melissa of selling her drugs earlier in the evening. *Id.* at 0:30–1:04 ("She sold me drugs a little while ago"). Clasping Nikki's 625g permit,[8] Officer  Babinski walked to the front of his squad car while talking to someone on his radio, blocked the dash camera for approximately 10 seconds, retreated to his car to run the Malibu's license plate and Nikki's permit, and then deactivated the dash camera at 4:11 AM, Babinski Cam, at 4:30–5:25; *see* ECF No. 67-7 at PageID.1002, which he told internal affairs he did because "Williamson approached to speak with him," ECF No. 67-12 at PageID.1134.

Speaking to the other officers beyond Officer Babinski's earshot, Rudy said his plan was to take Nikki home from the party, despite having to work the following day. Harris Cam, at 1:22–1:25. With slurred words, he acknowledged Nikki's visible injuries, placed his hands behind his back again as if preparing for arrest, requested the officers to follow them home, and then appeared

---

[5] Officer Julian Guevara worked for the Saginaw Police as of 2015. ECF No. 67-8 at PageID.1015.
[6] Officer Tyler Williamson worked for the Saginaw Police as of 2013. ECF No. 67-10 at PageID.1075.
[7] Officer Matthew Carpus has worked for the Saginaw Police since at least 2013.
[8] Officer Babinski testified in a deposition that he had no idea how to identify a 625g permit, ECF No. 67-7 at PageID.1002—which is issued to a driver who refuses or fails a chemical test, MICH. COMP. LAWS § 257.625g—even though he testified that he was trained on such matters, *see* ECF No. 67-7 at PageID.1003.

to acknowledge his intoxication. *Id.* at 1:37–1:45 ("If any more police pull up, I know for sure we're all going to jail. You guys, please, man. Follow us home, my boy. Man, I'm high, boy.").

Although Rudy offered his consent to a search of the Malibu, *id.* at 1:37–1:45 ("Bro you can search the car, vehicle's open to you guys, the door is open, I'm not resisting shit."), the officers declined his invitation, *id.* at 1:53–1:55 ("We actually appreciate that, we don't get too many people that, yeah."), for which Rudy thanked them, *id.* at 1:56–2:08 ("Man, I appreciate it officer, officer, I respect you as an officer, man.").

Nikki then repeated her story to Harris, again pleading for help in avoiding further legal trouble, acknowledging her three felony convictions, and explaining the events of the 911 call from Melissa's mother that precipitated the stop. *Id.* at 2:09–2:40. Harris recognized Nikki's concerns but deferred to Babinski to decide their fate. *Id.* at 2:55–3:15 ("He is the one that got on scene, and he is the one who pulled you over, so it's all gonna be on what he say and what he do.").[9]

Upon Officer Babinski's return, he questioned Lindsey, Nikki, and Rudy about their relationships, living arrangements, and plans for the night. First, Officer Babinski asked Lindsey for her name, residence, and whether she lives "with [Rudy]," which she confirmed. *Id.* at 3:42–3:52. Then Babinski asked Nikki whether she "stay[s] with [Rudy]," which she denied. *Id.* at 3:53–3:56. And after Babinski asked Nikki, "Where are you guys going tonight?," she responded that Rudy "was taking [her] home, and then he was going home." *Id.* at 3:58–4:01.

---

[9] According to Defendants' testimony, the Saginaw County Sherriff's Department divides officers into four districts, and the first officer from a respective district to arrive on the scene of a call within it becomes the "lead officer" of the investigation. ECF No. 67-9 at PageID.1050 ("Essentially you're still doing all the duties as a police officer, you're just going to be the one running point."). The rest of the officers may do nothing until the lead officer directs them to act or something arouses their suspicion enough to investigate. *See id.* at PageID.1049–50. And the decision to arrest or to release is setup like "a brain trust": the lead officers share their "thoughts" about how "the call should go," and then "the other officers weigh in to come up with the best possible outcome." *Id.* at PageID.1050.

Turning to Rudy, Officer Babinski asked, "You taking her home?," and Rudy responded, "Honestly, I don't know if I should be taking her home." *Id.* 4:02–4:09. Babinski responded, "Well you guys are all cool together, right?," and Rudy replied, "That's my guess, man." *Id.* at 4:10–4:12. The group collectively agreed, Officer Harris confirmed that "[t]hey're all good," *id.* 4:13–4:14, and then Babinski concluded, "I'm fine then," *id.* 4:15–4:16.

Although Officer Babinski was satisfied that the group was all "cool together," Officer Williamson interjected with apparent concern, "Well, hey, well I wanna speak to . . . .," but he was interrupted by Babinski telling Rudy to "go ahead and go home." *Id.* at 4:17–4:19.

Rudy expressed his gratitude as he extended a handshake to Officer Babinski, who declined and again told Rudy to take the group home. *Id.* at 4:19–4:23 ("We don't shake hands 'cause of skin and all that, but you guys go ahead and go home, alright."). Rudy widened his eyes in surprise, then gave more gratitude, saying, "Hey, listen man. You guys. Thank you, man. Have a good night. Thank you, man. God damn!" *Id.* at 4:23–4:31. The officers wished the group a good night and scattered to their squad cars. *Id.* at 4:32–4:54. As Officers Harris and Williamson sat in their squad car, Babinski cleared the call over the radio, *id.* at 5:05–5:09, prompting laughter from Harris, who remarked, "What is he doing? . . . . He's a dick," *id.* at 5:10–5:27. The entire interaction lasted less than five minutes.

Tragically, a mere four minutes and one point six miles later, Rudy crashed the Malibu into a tree, killing Lindsey and baby Amiliana. ECF Nos. 17-1 at PageID.246; 17-3 at PageID.226.

The Carrollton Township Police Department responded to the crash and reported a "strong odor of intoxication" from Rudy, who fled the scene "half naked" one block away into his sister's house, told the officers that "he was 'drunk,'" and asked them to "just shoot him." ECF No. 17-6 at PageID.242. "Other detectives completed interviews and seized property from [the] residence

where the involved parties had been prior to the crash." ECF No. 17-2 at PageID.203–09. A Carrollton Township deputy reported "the odor of alcohol coming from [Rudy] as he spoke" and an "open fifth [of liquor] in the vehicle." ECF Nos. 17-8 at PageID.282–83 ("Rodolfo stated that 'I told them that I was drunk' and 'take me to jail.'"); *see also* 67-2 at PageID.907. Rudy's blood test revealed a BAC of "0.200 grams alcohol per 100 milliliters blood." ECF No. 17-9 at PageID.287.

**C.**

On June 24, 2016, the Chief of the Saginaw County Police learned of Rudy's statements to the arresting officers that Defendants "told him to 'Get the fuck out of the City,'" that he "told them that [he] was drunk" and to "take [him] to jail," and that "he had open intoxicants in the vehicle." ECF No. 67-12 at PageID.1133.

Headed by Defendants' supervisor, Lieutenant David Kendziorski, the Saginaw Police Department initiated an Internal Affairs (IA) investigation on June 25, 2016. ECF No. 78-12 at PageID.1753. According to the final IA Report, the incident began with a 911 call reporting a fight at 3:44 AM, a second 911 call reporting a female being forced into a Malibu with expired plates at 3:49 AM, Officer Babinski located the Malibu at 4:07 AM, and the officers cleared the investigation before 4:15 AM. ECF No. 67-12 at PageID.1139–40.

Although the Report acknowledges that Rudy informed the officers that he was intoxicated and had open containers in the Malibu, Kendziorski chose not to interview him. *Id.* at PageID.1133.

Officer Guevara testified that all the officers involved convened before their interviews to "get on the same page," ECF No. 78-12 at PageID.1731–32, which he added is "typically what [Saginaw Police Officers] do," ECF No. 78-15 at PageID.1996–97.

The Report carefully chronicles interviews with each of the five officers. Notably, Officer Babinski told IA that he ran Nikki's license, that Nikki appeared as though she "could have been drinking," and that he had deactivated his in-car camera when Officer Williamson approached to speak with him. ECF No. 67-12 at PageID.1133–34. And Officer Carpus said he suspected Rudy had a drink or two. *Id.* at PageID.1135.

Based on the recorded interviews, the IA Report concludes that all the officers—except for Officer Harris—had violated several department policies by failing to employ their body cameras and in-car recording systems. *Id.* at 1133–40. All the officers also claimed in their interviews that they did not see the Malibu leave or who got into the Malibu. *Id.* at 1133–37. However, Guevara later acknowledged in his deposition testimony that he followed the Malibu for an unknown period, which was confirmed by a video recording. Guevara Dep., ECF No. 78-15 at PageID.2034.

Officer Babinski later testified that Kendziorski "deleted" all the interview recordings after conducting a "confusing" IA investigation. Babinski Dep., ECF No. 78-7 at PageID.1471.

### D.

Rudy pleaded no contest in the Tenth Circuit Court of Saginaw County and was sentenced in January 2017 as a third-offense habitual offender, MICH. COMP. LAWS § 769.11, to 150–300 months' imprisonment for operating while intoxicated causing death, MICH. COMP. LAWS § 257.625(4), and 57–120 months' imprisonment for operating while intoxicated causing serious injury, MICH. COMP. LAWS § 257.625(5). *People v. Sanchez*, No. 343834, 2019 WL 2397304, at *1 (Mich. Ct. App. June 6, 2019) (per curiam), *remanded in part, appeal denied in part*, 943 N.W.2d 116 (Mich. 2020) (mem.); ECF No. 67-3 at PageID.924-30. His appeal is in abeyance before the Michigan Supreme Court. *People v. Sanchez*, 977 N.W.2d 552 (Mich. 2022) (mem.).

Probate proceedings are pending for both decedents. *In re Lindsey Marie Drake*, No. 19-139289-DE (Mich. Prob. Ct. Saginaw Cnty. Aug. 1, 2019) (appointing Attorney John J. Swartz Jr. as personal representative); *In re Amiliana Kay Sanchez*, No. 19-139284-DE (Mich. Prob. Ct. Saginaw Cnty. July 10, 2019) (appointing Attorney Hugh R. LeFevre as personal representative).

The estates of Lindsey Drake and Amiliana Sanchez ("Plaintiffs") brought the following three claims in June 2020:

(1) Count I: State-Created Danger under 42 U.S.C. § 1983;
(2) Count I: State-Created Danger under the Michigan Constitution; and
(3) Count II: Municipal Liability under 42 U.S.C. § 1983.

ECF No. 17 at PageID.193–197.

Defendants seek summary judgment on the claims for State-Created Danger.[10] *Drake*, No. 1:20-CV-11684, ECF No. 66 (E.D. Mich. Jan. 30, 2023); *Sanchez*, No. 1:20-CV-11685, ECF No. 67 (E.D. Mich. Jan. 30, 2023). In sum, the parties disagree about whether Defendants knew Rudy Sanchez was intoxicated and were deliberately indifferent to the risk of harm to Plaintiffs.

## II.

To prevail on summary judgment, the movant must identify record evidence showing that there is no genuine dispute as to any material fact and that they are entitled to judgment as a matter of law. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986); FED. R. CIV. P. 56(a). If so, then the burden shifts to the nonmovant to identify specific facts that create "a genuine issue for trial," *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986) (citation omitted), which requires more

---

[10] The Municipal Liability claims have been dismissed along with the City of Saginaw and the Saginaw Police Department. *Est. of Drake v. City of Saginaw*, No. 1:20-CV-11684, 2020 WL 7122076, at *8 (E.D. Mich. Dec. 4, 2020) ("Plaintiff has simply not alleged any facts of prior unconstitutional conduct by the City of Saginaw or the City of Saginaw Police Department."); *accord Est. of Sanchez v. City of Saginaw*, No. 1:20-CV-11685, 2020 WL 7122085, at *8 (E.D. Mich. Dec. 4, 2020). And the Parties stipulated to dismiss Defendant Matthew Carpus. *Drake*, ECF No. 79; *Sanchez*, ECF No. 79.

than "a mere scintilla of evidence," *id.* at 251, more than "metaphysical doubt," *Matsushita Elec. Indus. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). All inferences must be reasonable, logical, and drawn in the nonmovant's favor to determine whether one party must prevail as a matter of law. *Liberty Lobby*, 477 U.S. at 251–52.

### III.

Defendants seek qualified immunity against Plaintiffs' claim of a state-created danger. To overcome the presumption of qualified immunity asserted by Defendants, Plaintiff must demonstrate that "(1) the defendant violated a constitutional right and (2) that right was clearly established." *McDonald v. Flake*, 814 F.3d 804, 812 (6th Cir. 2016).

### A.

When the defendant officers released Rudy Sanchez to drive while inebriated and high on drugs in June 2016, Plaintiffs' substantive-due-process right[11] to be free from state actors' deliberate indifference to state-created dangers was clearly established.

Since September 1988, the right to be free from police officers' deliberate indifference—recklessness—to the risk of harm from intoxicated drivers has been clearly established. *Reed v. Gardner*, 986 F.2d 1122, 1127 (7th Cir. 1993) ("These defendants, however, did engage in reckless conduct similar to the officer who left a passenger alone and on foot in a high crime area or the officers who arrested a driver and left young children stranded on the highway." (internal citations omitted)); *Guertin v. State*, 912 F.3d 907, 932 (6th Cir. 2019) ("In making this determination, 'we must look first to decisions of the Supreme Court, then to decisions of this court and other courts

---

[11] To the extent that Plaintiffs procedural due process, they "do not have a right to state protection against private harm." *Lipman v. Budish*, 974 F.3d 726, 750–52 (6th Cir. 2020) (citing *DeShaney v. Winnebago Cnty. Dep't of Soc. Servs.*, 489 U.S. 189, 197 (1989)). The right to be free from state-created dangers is purely substantive.

within our circuit, and finally to decisions of other circuits.'" (quoting *Baker v. City of Hamilton*, 471 F.3d 601, 606 (6th Cir. 2006))); *Vanderhoef v. Dixon*, 938 F.3d 271, 278 (6th Cir. 2019) (holding that the date of the incident in a case is when the right became clearly established; *see also Koulta v. Merciez*, 477 F.3d 442, 446–47 (6th Cir. 2007) (adopting *Reed*'s reasoning).

Similarly, it has been clearly established since May 1999 that "a deliberate-indifference standard is clearly the appropriate one" for analyzing whether officers created or increased a danger if they "not only had time to deliberate on what to do with [the suspect] but actually did deliberate on this point." *Bukowski v. City of Akron*, 326 F.3d 702, 710 (6th Cir. 2003); *see also Lipman v. Budish*, 974 F.3d 726, 750 n.13 (6th Cir. 2020) ("[T]he right at issue here is the right against a state official acting to increase an individual's risk of private violence with the knowledge of or at least deliberate indifference to that increased risk." (quoting *Mullenix v. Luna*, 577 U.S. 7, 11, (2015) (per curiam))); *May v. Franklin Cnty. Comm'rs*, 437 F.3d 579, 584 (6th Cir. 2006) ("As we have stated, 'state officials may violate the Due Process Clause when their affirmative actions directly increase the vulnerability of citizens to danger or otherwise place citizens in harm's way.'" (quoting *Ewolski v. City of Brunswick*, 287 F.3d 492, 509 (6th Cir. 2002))); *Kallstrom v. City of Columbus*, 136 F.3d 1055, 1059, 1065–67 (6th Cir. 1998) (finding a state-created danger based on the release of private information "in the fall of 1995").

Indeed, only "plainly incompetent" officers could imagine they would get qualified immunity from the death of a passenger in a vehicle that they ordered a hesitant drunk driver to operate after the officers were invited but refused to investigate possible drunk driving. *See Malley v. Briggs*, 475 U.S. 335, 341 (1986); *Ashcroft v. al-Kidd*, 563 U.S. 731, 741 (2011) (holding that a right is clearly established if "every reasonable official would have understood that what he is doing violates that right" (cleaned up) (quoting *Anderson v. Creighton*, 483 U.S. 635, 640 (1987)));

*see also Hope v. Pelzer*, 536 U.S. 730, 731 (2002) (holding that "officials can be on notice that their conduct violates established law even in novel factual situations" because "the salient question . . . is whether the state of the law in [2016] gave respondents fair warning that their alleged treatment of [Plaintiffs] was unconstitutional").

**B.**

In order to prove their claim for state-created danger, Plaintiffs must demonstrate:

(1) an affirmative act of the state that created or increased their risk of exposure to a third party's violent act;
(2) a special danger to which the state's actions placed the plaintiff specifically at risk, as distinguished from a risk that affects the public at large; and
(3) that the state knew or should have known its affirmative act specifically endangered the plaintiff.

*Lipman*, 974 F.3d at 744 (quoting *Cartwright v. City of Marine City*, 336 F.3d 487, 493 (6th Cir. 2003)).

As a threshold matter, the officers' knowledge in this case is attributable to each of the officers present. The collective-knowledge doctrine imputes the officers' knowledge and responsibility based on the practical reality that "effective law enforcement" requires officers to "act on directions and information transmitted by one officer to another." *United States v. Lyons*, 687 F.3d 754, 766 (6th Cir. 2012) (quoting *United States v. Hensley*, 469 U.S. 221, 231 (1985); *United States v. Redmond*, 475 F. App'x 603, 607 (6th Cir. 2012) ("Probable cause for arrest may emanate from collective police knowledge."). In determining probable cause for an arrest, "[t]he collective knowledge of agents working as a team is to be considered together." *United States v. Duval*, 742 F.3d 246, 253 (6th Cir. 2014) (quoting *United States v. Woods*, 544 F.2d 242, 259–60 (6th Cir. 1976)). In this way, the "reviewing court" should consider the collective knowledge of officers who were "in close communication with one another"—"not just the knowledge of the individual officer who physically effected the arrest." *Id.* (quoting *Woods*, 544 F.2d at 260). By

imputing the officers' knowledge to each other, the collective-knowledge doctrine "'preserves the propriety of the stop' and avoids crippling restrictions on our law enforcement." *Lyons*, 687 F.3d at 766 (quoting *United States v. Ibarra-Sanchez*, 199 F.3d 753, 760 (5th Cir. 1999)).

Here, Officers Guevara, Williamson, and Harris acted under Officer Babinski's direction, relied on his reasonable suspicion in effectuating the stop, and shared information with him and each other both on and off camera. *See* discussion *supra* Part I. Therefore, it is reasonable to attribute their knowledge collectively. *Bey v. Falk*, 946 F.3d 304, 316 (6th Cir. 2019) ("The doctrine applies 'even when the evidence demonstrates that the responding officer was wholly unaware of the specific facts that established reasonable suspicion for a stop.'" (quoting *United States v. Hensley*, 469 U.S. 221, 230–31 (1985))); *see also Lyons*, 687 F.3d at 767 (holding that the collective-knowledge doctrine applied "[a]s soon as [the lead officer] spoke to the [other officers] and informed them of the [relevant] investigation"); *United States v. Kaplansky*, 42 F.3d 320, 327 (6th Cir. 1994) (en banc) ("It was permissible for [the officers] to rely upon the dispatcher's conclusion that Kaplansky was 'suspicious' without inquiring into the basis of the dispatcher's knowledge."); Matthew N. Preston II, *The Tweet Test: Attributing Presidential Intent to Agency Action*, 10 BELMONT L. REV. 1, 21 (2022) ("The intent analysis should be based on reasonable factual assumptions about which statements most likely played a role in the agency's decisionmaking process.").

## 1.

Plaintiffs have satisfied the second element beyond any reasonable doubt: a special danger to which the state's actions placed them specifically at risk. Defendants knew the finite group of people who would be in the Malibu: Rudy, Nikki, Lindsey, and baby Amiliana. As described above and seen in the video, Defendants collectively questioned the group about where they lived, where

they were headed, whether Rudy would drive them home, and whether Rudy was "good" to drive them. *See* discussion *supra* Part I. Officer Harris then confirmed they were "all good," and Officer Babinski encouraged them all to agree they were "cool together." *Id.* Thus, this case satisfies the required "discrete group of individuals." *See Koulta v. Merciez*, 477 F.3d 442, 447 (6th Cir. 2007). Accordingly, even drawing all reasonable inferences in favor of the *movants*, every reasonable juror would conclude that Rudy driving drunk and high presented a special danger to the passengers in his car. *See Jones v. Reynolds*, 438 F.3d 685, 696 (6th Cir. 2006) ("In the only cases where we have recognized a 'state created danger,' the government could have specified whom it was putting at risk, nearly to the point of naming the possible victim or victims.") (collecting cases); *Kneipp v. Tedder*, 95 F.3d 1199, 1209 n.22 (3d Cir. 1996) ("The relationship requirement under the state-created danger theory contemplates some contact such that the plaintiff was a foreseeable victim of a defendant's acts in a tort sense.").

### 2.

A reasonable juror could conclude Defendants knew or should have known Rudy was intoxicated. The video shows that Rudy's speech seemed slurred, he was shirtless in the street at 4:00 AM, he offered the officers his permission to search the car, he asked them to follow him home, he suggested he was unable to drive, he parked in the middle of the roadway, the Malibu's plates were expired, his sister was drunk with a suspended license for driving while inebriated underage, the group had just left a fight at a party where everyone was drinking, and the mother of a partygoer called the police and reported that Rudy was drunk and forced a woman into his car. *See* discussion *supra* Part I. And if Defendants had investigated these circumstances they testified were "not normal," *e.g.*, ECF No. 67-7 at PageID.982, then they would have learned Rudy had a suspended license for being "arrested for OWI and open intoxicants" 26 days earlier, *see* ECF No.

- 14 -

17-6 at PageID.237 ("Sanchez was asked to pick a number between 17–15. [He] stated 34."). In addition, Officer Carpus testified that "he thought [Rudy] had a drink or two because of the time of night and he encounters many people who had been drinking and are still up." ECF No. 67-12 at PageID.1135; *accord* ECF No. 67-11 at PageID.1107 ("I said I was hypothesizing that maybe he had one or two drinks."). Indeed, Michigan law presumes that Rudy had a BAC of 0.200 when he interacted with Defendants. *See* MICH. COMP. LAWS § 257.625a(6)(a) (2015) (amended 2018) ("The amount of alcohol . . . in a driver's blood . . . as shown by chemical analysis . . . is admissible into evidence in any civil or criminal proceeding and is presumed to be the same as at the time the person operated the vehicle.").

And additional evidence suggests Officers Babinski and Guevara knew or should have known Rudy was intoxicated. Rudy testified that he told Guevara he had "been drinking" before Officer Harris's body camera started to record, *see* ECF No. 67-2 at PageID.906, and that Guevara responded to "[g]et the fuck out of Saginaw" because he "didn't want to see [Rudy] again for the night," *id.* at PageID.903; *see Good v. BioLife Plasma Servs.*, 834 F. App'x 188, 195–96 (6th Cir. 2020). The officer who arrested Rudy reported the same. ECF No. 17-8 at PageID.283. Further, Rudy described his prerecorded pullover experience at length, including his request for the officers to "drive [his] vehicle" and their response that they would "impound [his] car, take [him] to jail, and give [the group] a ride to where they got to go" if he was "not going to drive." ECF No. 67-2 at PageID.906. But then more officers appeared, so the group could not leave. If true, then at least Officers Babinski and Guevara knew Rudy was intoxicated. And, though Babinski testified that he "might have noticed something," he also testified that he could not "recall that in [his] brain" at that time. ECF No. 67-7 at PageID.985. Indeed, as he told internal affairs during a video-recorded interview, "Nikki Cortez could have been drinking" because "she was emotional

and crying so her eyes might have been bloodshot, and she was emotional, and a lot of times when people are intoxicated they are emotional." *Id.* at PageID.986.

For these reasons, there is a genuine question of fact as to whether Defendants knew or should have known Rudy was too intoxicated to operate a vehicle legally.

**3.**

Thus, the question becomes "whether [Plaintiffs] w[ere] safer before state intervention than after it." *Barefield v. Hillman*, No. 20-6002, 2021 WL 3079693, at *4 (6th Cir. July 21, 2021) (citing *Cartwright v. City of Marine City*, 336 F.3d 487, 493 (6th Cir. 2003)); *accord Lipman v. Budish*, 974 F.3d 726, 744, 750 & n.13 (6th Cir. 2020) ("Instead, to find a state-created danger, the plaintiff must have been 'safer *before* the state action than he was *after* it.'") (collecting cases).

Or whether Plaintiffs were safer sitting in the deactivated, driverless, parked car than they were after Defendants ordered them to go home in the car with a drunk driver. *See Barefield*, 2021 WL 3079693, at *4 ("Or, alternatively, whether he was safer when he was at large after escaping the [Volunteer Youth Academy] than he was [where the officers placed him].").

The people's "interest in preserving [their] life is one of constitutional dimension." *Nishiyama v. Dickson Cnty.*, 814 F.2d 277, 280 (6th Cir. 1987) (en banc). If a state agent exposes someone to a harm that would not otherwise exist, then the state agent is liable for a state-created danger. *Jones v. Union Cnty.*, 296 F.3d 417, 428 (6th Cir. 2002) (citations omitted). But police officers do not commit an affirmative act by merely returning someone to a preexisting danger. *McQueen v. Beecher Cmty. Schs.*, 433 F.3d 460, 466 (6th Cir. 2006) (citing *Bukowski v. City of Akron*, 326 F.3d 702, 709 (6th Cir. 2003)); *see also May v. Franklin Cnty. Comm'rs*, 437 F.3d 579, 585–86 (6th Cir. 2006) ("[W]e decline to interpret the Due Process Clause in such a manner as to discourage law enforcement officers from responding to requests for assistance.").

- 16 -

Police officers who have "affirmatively encouraged, emboldened, or enabled" a private citizen to operate a vehicle while intoxicated have created or increased the risk of harm to foreseeable victims. *See Est. of Smithers v. City of Flint*, No. 2:05-CV-40347, 2009 WL 117623, at *10 (E.D. Mich. Jan. 16, 2009) (citation omitted), *aff'd*, 602 F.3d 758 (6th Cir. 2010).

Seeking qualified immunity, Defendants rely on *Koulta v. Merciez*, 477 F.3d 442–44 (6th Cir. 2007). But *Koulta* is confined to a negligent police officer who (1) instructed a person who drove drunk and was sitting in a car to leave the area and (2) did not investigate a possible DUI that no evidence or person prompted him to investigate. *E.g.*, *Harris v. City of Knoxville*, No. 3:12-CV-00319, 2013 WL 3423895, at *6 (E.D. Tenn. July 8, 2013).

Such negligence is distinct from the reasonably inferable deliberate indifference in this case, which would undoubtedly be an affirmative act for purposes of proving a state-created danger. *Gladden v. Richbourg*, 759 F.3d 960, 967 (8th Cir. 2014) ("But they are not so entitled [to qualified immunity] if [the driver] was so intoxicated that [the officers] acted recklessly in conscious disregard of an obvious harm to [the plaintiffs] such that their actions evince deliberate indifference to [the plaintiff's] constitutional rights."); *see also Ewolski v. City of Brunswick*, 287 F.3d 492, 511 (6th Cir. 2002) ("[T]he more appropriate standard of review is 'deliberate indifference.'").

Here, the record reasonably suggests Defendants "affirmatively encouraged, emboldened, or enabled" Rudy to drive drunk. *See Est. of Smithers v. City of Flint*, No. 2:05-CV-40347, 2009 WL 117623, at *10 (E.D. Mich. Jan. 16, 2009) (citing *Koulta*, 477 F.3d at 447), *aff'd*, 602 F.3d 758 (6th Cir. 2010). After Rudy informed Defendants he had consumed alcohol, they allegedly threatened to impound his car if he did not drive the group home. *See* discussion *supra* Part I. Then Rudy not only requested Defendants to follow him home but also voluntarily consented to a search

- 17 -

of the Malibu, which contained an open bottle of vodka. *Id.* But Defendants declined Rudy's offer, refusing even to glance inside the Malibu, *id.*, despite their "responsibility," as they referred to it, "to get as much information as possible," ECF No. 67-7 at PageID.990. As Guevara testified, to release Rudy to drive drunk "would [have been] against department policy" and "the laws of the State of Michigan." ECF No. 67-8 at PageID.1030–31. On the other hand, as Defendants testified, arresting Rudy would not have qualified for the "grant money to ramp up efforts for drinking and driving," because they found him at 4:00 AM—an hour too late to qualify. *Id.* at PageID.979. ("I think it's a 9:00 PM to 3:00 AM grant."). This apparent endorsement contrasts with *Koulta*, where the officers did not require or encourage anyone to enter a dangerous situation. *Cf. Richardson v. Huber Heights City Sch. Bd. of Educ.*, 651 F. App'x 362, 366 (6th Cir. 2016) ("But a jury would also be justified in concluding that school officials turned a blind eye to hazing at Wayne—particularly within its athletic programs—to the extent that a comment from a coach inviting upperclassmen to 'take care of' a problem elicited sexual assault as a preferred alternative to outright violence.").

Another key difference is that Defendants here ordered the deceased Plaintiffs to enter a car with a drunk driver. Indeed, Babinski said he "expected the[ group] to drive home," ECF No. 67-7 at PageID.992, even though Rudy suggested he could not drive, asked for assistance, expressed fear of arrest, and stopped the car due to his reckless driving before the officers ordered him back into it, *see* discussion *supra* Part I. Arguably then, as Rudy testified, "the circumstances changed with the contact with the officers." ECF No. 67-2 at PageID.922.

Based on those affirmative acts, Defendants were deliberately indifferent by consciously disregarding a known risk. *E.g.*, *Kneipp v. Tedder*, 95 F.3d 1199, 1208 (3d Cir. 1996) (finding "a material issue" based on an officer's "willful disregard for [the plaintiff]'s safety"). Indeed, Nikki

and Lindsey might not have reconciled, leaving Lindsey "calling a cab" with baby Amiliana in her arms. *See Koulta*, 447 F.3d at 446. Since Rudy was outside the Malibu when the group was arguably forced into this intoxicated expedition, Defendants at least *recreated* the danger.

Extending *Koulta* to this case would yield an absurd result because it would immunize officers who order someone who has already driven drunk to do so again—effectively promoting drunk driving. *See* ECF No. 67 at PageID.877–78. Indeed, *Koulta* acknowledged a state-created danger "when officers arrested a sober driver, took her into custody[,] and left the keys with her visibly drunk husband." *Koulta*, 477 F.3d at 447 (citing *Reed v. Gardner*, 986 F.2d 1122, 1126 (7th Cir. 1993)). Indeed, Defendants' regime would contradict the Due Process Clause's purpose "to protect the people from the State." *DeShaney v. Winnebago Cnty. Dep't of Soc. Servs.*, 489 U.S. 189, 196 (1989). For it would permit state officials to evade liability by merely determining which drunk person had already driven and then ordering that person to drive everyone home.

If this case does not present a question of fact concerning whether an officer may be liable under the Due Process Clause for the "decision to permit someone he knows to have been drinking to continue driving without administering a breathalyzer," *Koulta*, 477 F.3d at 445, then, apart from police begging people to drive drunk, no case ever will. True, Defendants did not provide a fully equipped, clearly marked patrol car to a felon or ignore reports of him pulling people over. *E.g.*, *Nishiyama v. Dickson Cnty.*, 814 F.2d 277, 280 (6th Cir. 1987) (en banc). Nor did they buy Rudy drinks or hand him the keys to the car. *E.g.*, *Reed v. Gardner*, 986 F.2d 1122, 1127 (7th Cir. 1993). But they did much more than nothing when nothing was asked. *E.g.*, *Koulta*, 477 F.3d at 446. They located a drunk driver and his family outside a parked car with the engine off and ordered him to drive them all home after he expressed discomfort with the decision—even threatening to impound the car if he did not do so. In this way, the officers arguably took a

deliberate action under color of state law, leaving Plaintiffs vulnerable to death. *Ewolski*, 287 F.3d at 509 ("If the state puts a man in a position of danger from private persons and then fails to protect him, . . . it is as much an active tortfeasor as if it had thrown him into a snake pit." (quoting *Bowers v. DeVito*, 686 F.2d 616, 618 (7th Cir. 1982))).

In conclusion, this case presents a question of fact with respect to whether police officers are liable under the Due Process Clause for ignoring a known drunk driver's reluctance to drive and ordering him and his passengers to enter, to start, and to drive the vehicle home. Because Rudy Sanchez was outside the car, informed the officers he was intoxicated, expressed concerns about driving, asked the officers to follow him home, volunteered for a search, and repeatedly said he believed he was going to jail—where the officers heard all that, refused to investigate, and threatened to impound his car if he did not get in the car and drive drunk—this case falls on the "[]action side of the line." *Koulta*, 477 F.3d 442, 446 (6th Cir. 2007); *see also Munger v. City of Glasgow Police Dep't*, 227 F.3d 1082, 1086 (9th Cir. 2000) ("[W]e examine whether the officers left the person in a situation that was more dangerous than the one in which they found him."); *Est. of Smithers v. City of Flint*, 602 F.3d 758, 764 (6th Cir. 2010) ("The officers did not *require or encourage* plaintiffs to remain in the unlocked house or suggest that Washington would be held for 20 hours so as to imply that plaintiffs would be safe." (emphasis added)); *Walker v. Evans*, No. 2:10-CV-12596, 2012 WL 917772, at *6 (E.D. Mich. Mar. 19, 2012) ("[T]he defendant had increased the risk of the assault by requiring the plaintiff to remain at home alone with her stepfather during the day." (citing *Wilson v. Columbus Bd. of Educ.*, 589 F.Supp.2d 952, 962 (S.D. Ohio 2008))), *aff'd sub nom. Walker v. Detroit Pub. Sch. Dist.*, 535 F. App'x 461 (6th Cir. 2013).

For those reasons, it is for the jury to decide whether Defendants were deliberately indifferent to the danger Rudy posed to his passengers and are thus responsible for the wrongful deaths of Lindsey Drake and baby Amiliana.[12] But that is not the end of the analysis.

### 4.

"The thornier question is whether [Defendants'] failure to act proximately caused [Plaintiffs'] injury." *Powers v. Hamilton Cnty. Pub. Def. Comm'n*, 501 F.3d 592, 609 (6th Cir. 2007); *see also First Midwest Bank v. City of Chicago*, 988 F.3d 978, 988 (7th Cir.) ("A plaintiff must show that the state affirmatively placed him in a position of danger and that the state's failure to protect him from that danger was the proximate cause of his injury." (citing *Buchanan-Moore v. Cnty. of Milwaukee*, 570 F.3d 824, 827 (7th Cir. 2009)), *cert. denied*, 142 S. Ct. 389 (2021). Proximate cause is "[u]sually" a question for jury. *Clay v. Weidner*, No. 1:19-CV-01916, 2020 WL 3259147, at *9 (N.D. Ohio June 16, 2020) (quoting *Harris v. Bornhorst*, 513 F.3d 503, 519 (6th Cir. 2008)).

The question of liability under § 1983 is binary: state actors are liable for either all the harm or none of it. *See Blair v. Harris*, 993 F. Supp. 2d 721, 727 (E.D. Mich. 2014) ("[I]t is well settled that comparative negligence does not apply to damages for federal constitutional-rights violations." (two citations omitted) (citing *McHugh v. Olympia Ent.*, 37 F. App'x 730 (6th Cir. 2002). Simply put, in a state-created-danger case, there is only one proximate cause at issue.

Apart from the potential that Defendants' conduct increased the risk of harm, this case presents plenty of potential proximate causes. Lindsey's decision to join Rudy's joyride, thrice,

---

[12] Although "illegal conduct under the state law cannot add to or subtract from the 'constitutional validity' of a state's actions," *Kneipp v. Tedder*, 95 F.3d 1199, 1210–11 (3d Cir. 1996) (cleaned up) (quoting *D.R. ex rel. L.R. v. Middle Bucks Area Vocat'l Tech. Sch.*, 972 F.2d 1364, 1375 (3d Cir. 1992) (en banc)), it is worth noting that Defendants' arguably aided and abetted drunk driving in violation of Michigan law, *see People v. Robinson*, 715 N.W.2d 44, 47–48 (Mich. 2006).

could be the proximate cause. On the other hand, Rudy testified that he "possibly" crashed because Nikki hit him while he was driving. ECF No. 67-2 at PageID. 908. But he "can't say for sure," *id.*, as he also might not have crashed "if [h]e had brakes," ECF No. 67-2 at PageID.904. Or maybe it was just his drunk driving. *See* ECF No. 67-3 at PageID.926 ("I don't blame anybody else for not stopping this situation. I blame myself for driving that vehicle.").

Thus, the jury must balance the competing evidence to determine whether Defendants were the sole proximate cause of the deaths of Lindsey Drake and her baby Amiliana Sanchez.

**IV.**

Accordingly, it is **ORDERED** that Defendants' Motion for Summary Judgment, *Est. of Drake v. City of Saginaw*, No. 1:20-CV-11684 (E.D. Mich. Jan. 30, 2023), ECF No. 66, is **DENIED**.

Further, it is **ORDERED** that Defendants' Motion for Summary Judgment, *Est. of Sanchez v. City of Saginaw*, No. 1:20-CV-11685 (E.D. Mich. Jan. 30, 2023), ECF No. 67, is **DENIED**.

**This is not a final order and does not close the above-captioned case**.


Dated: June 20, 2023                                   s/Thomas L. Ludington
                                                       THOMAS L. LUDINGTON
                                                       United States District Judge